In the Supreme Court of Georgia

Decided:    March 21, 2016

S15A1442.  GEBREKIDAN v. CITY OF CLARKSTON.

NAHMIAS, Justice.

Aster Zeru Gebrekidan filed an application for discretionary appeal to challenge her conviction and fine for violating a City of Clarkston ordinance that prohibits certain retailers of packaged alcoholic beverages from allowing on their premises any form of electronic or mechanical game machine or coin-operated device that may be used for entertainment or amusement purposes. We granted Gebrekidan's application to decide whether the State's detailed statutory scheme regulating coin operated amusement machines (COAMs) and COAM businesses in Georgia, see OCGA §§ 16-12-35 and 50-27-70 to 50-27-104 (COAM Laws), preempts the City's ordinance under the Uniformity Clause of the Georgia Constitution, see Ga. Const. of 1983, Art. III, Sec. VI, Par. IV (a). As explained below, we conclude that the State's COAM Laws preempt the

City's ordinance at least insofar as the ordinance applies to COAMs as defined by the state statutes, and we therefore reverse Gebrekidan's conviction and fine.

1.    Gebrekidan operates a convenience store in Clarkston where she sells packaged beer, malt beverages, and wine for consumption off-premises and also offers COAMs for play pursuant to a state license granted pursuant to the COAM Laws. Chapter 3 of the City of Clarkston Code of Ordinances (City Code), entitled "Alcoholic Beverages," includes the following provision:

> Sec. 3-57. - Machines operated for amusement purposes on retail premises.
>
> No retail dealer in packaged beer, malt beverages or wine shall permit on his premises any slot machines or mechanical music boxes or pinball machines or any form of electronic or mechanical game machine or coin-operated device which might be used for entertainment or amusement purposes.

On June 5, 2014, the City cited Gebrekidan for violating § 3-57 by "[o]perating coin-operated amusement machines in [a] retail store selling packaged beer, malt beverages or wine," and she was ordered to appear in the Municipal Court of Clarkston to answer the charge. Gebrekidan filed a motion to dismiss the citation based on the Uniformity Clause, arguing that the COAM Laws preempt City Code § 3-57. On September 9, 2014, the municipal court

2

held a hearing and announced that it would deny the motion. Gebrekidan requested an immediate bench trial, waived the appearance of witnesses against her, and entered a stipulation with the prosecutor that she "offered coin-operated amusement machines for play and packaged alcohol for sale at the same location . . . [and] was licensed by the State of Georgia to operate coin-operated machines." In a written order entered on September 15, 2014, the municipal court found Gebrekidan guilty as charged and fined her $250. On the preemption issue, the court held that City Code § 3-57 "is a fair and reasonable ordinance under the City's police powers that serves an important public interest, it does not conflict with general laws and accordingly, it is not preempted by State law."

Gebrekidan obtained review by certiorari in the Superior Court of DeKalb County, raising only her preemption claim. After a hearing on January 12, 2015, the superior court entered an order affirming Gebrekidan's conviction on February 6, 2015. The court held that § 3-57 is "primarily a regulation of alcohol rather than COAM[s]" due to its placement in the Alcoholic Beverages chapter of the City Code and because it prohibits all types of games and entertainment machines at packaged alcohol stores and not just COAMs as

3

defined by the state law. The court recognized that "[t]he State law regulating COAM[s] is voluminous," but ruled that § 3-57 is "a reasonable exercise of the City's discretionary power to set rules for alcohol sales . . . authorized by O.C.G.A. § 3-3-2."[1] The court concluded that "City Code § 3-57 is not a local COAM regulatory system at all and does not duplicate any of the provisions of [the COAM Laws]." Gebrekidan filed a timely application for discretionary appeal, which this Court granted on April 2, 2015. The case was orally argued on September 15, 2015.[2]

2. State statutes generally control over local ordinances on the same subject. See City of Buford v. Georgia Power Co., 276 Ga. 590, 590 (581 SE2d

---

[1] OCGA § 3-3-2 (a) says:

Except as otherwise provided for in this title, the manufacturing, distributing, and selling by wholesale or retail of alcoholic beverages shall not be conducted in any county or incorporated municipality of this state without a permit or license from the governing authority of the county or municipality. Each such local governing authority is given discretionary powers within the guidelines of due process set forth in this Code section as to the granting or refusal, suspension, or revocation of the permits or licenses; provided, however, that residency by an applicant within the city or county issuing the permit or license shall not be a requirement by the respective local governing authority if the applicant designates a resident of the city or county who shall be responsible for any matter relating to the license.

[2] Amicus curiae briefs have been filed by the Georgia Municipal Association, Inc. and by the Georgia Amusement and Music Operators Association of Georgia and 42 independently owned and franchised convenience stores.

4

16) (2003); <u>Franklin County v. Fieldale Farms Corp.</u>, 270 Ga. 272, 273 (507

SE2d 460) (1998). This doctrine, known as state preemption, is rooted

primarily in the Georgia Constitution's Uniformity Clause, which now reads:

> Laws of a general nature shall have uniform operation throughout this state and no local or special law shall be enacted in any case for which provision has been made by an existing general law, except that the General Assembly may by general law authorize local governments by local ordinance or resolution to exercise police powers which do not conflict with general laws.

Ga. Const. of 1983, Art. III, Sec. VI, Par. IV (a). See generally <u>Fieldale Farms</u>,

270 Ga. at 273-275 (reviewing the historical development of the state

preemption doctrine in Georgia).[3]

Under the first part of the Uniformity Clause, which carried forward

language similar to that of previous Constitutions, the General Assembly may

preempt local ordinances on the same subject as a general law either expressly

or by implication. See <u>Fieldale Farms</u>, 270 Ga. at 275. In express preemption,

the statutory text speaks to the need for statewide uniformity on the subject in

question or to the lack of local authority to regulate the subject of the general

---

[3] Several other constitutional provisions address preemption in various contexts, but the parties do not contend that these provisions control in this case. See, e.g., Ga. Const. of 1983, Art. III, Sec. VI, Par. VII; Art. IX, Sec. II, ¶ I (a), (c); Art. IX, Sec. VII, ¶ V.

law.[4]  In implied preemption, the intent of the General Assembly to preempt local regulation on the same subject as the general law is inferred from the comprehensive nature of the statutory scheme.[5]  In this context, the General Assembly speaks through its silence as well as its words; the broad scope and reticulated nature of the statutory scheme indicate that the legislature meant not only to preclude local regulation of the various particular matters to which the general law directly speaks, but also to leave unregulated by local law the matters left unregulated in the interstices of the general law.

---

[4]  See, e.g., City of Buford, 276 Ga. at 590 (finding express preemption of a municipal ordinance placing a one-year moratorium on the construction of electric power substations within 500 feet of residentially zoned property, where a state statute prohibited local ordinances "expanding the power of regulation over any business activity regulated by the Public Service Commission beyond that authorized by charter or general law or by the Constitution"); GeorgiaCarry.org, Inc. v. Coweta County, 288 Ga. App. 748, 748-749 (655 SE2d 346) (2007) (finding express preemption of a local ordinance prohibiting firearms on or near county recreation facilities and sports fields, where a state statute said that "[n]o county or municipal corporation, by zoning or by ordinance, resolution, or other enactment, shall regulate in any manner . . . the possession, ownership, transport, [or] carrying . . . of firearms or components of firearms"); Hortman v. Guy, 242 Ga. App. 174, 176 (529 SE2d 182) (2000) (finding express preemption of a local animal control ordinance that expanded the class of persons responsible for ensuring that livestock were fenced in or otherwise prevented from straying onto public roads and other people's property, where the General Assembly "found and declared a necessity for a uniform state-wide livestock law embracing all public roads in the state and all other property" in the statutes abolishing the open range).

[5]  See City of Buford, 276 Ga. at 590; Fieldale Farms, 270 Ga. at 276.  See also City of Atlanta v. S.W.A.N. Consulting & Sec. Servs., Inc., 274 Ga. 277, 279 (553 SE2d 594) (2001) (explaining that the legislative intent to preempt local laws may be inferred "'from the sweeping language and broad scope' of a general act regulating an industry on a statewide basis'" (citation omitted)).

The 1983 Constitution added an exception to the basic preemption rule with the "except" provision of the Uniformity Clause. See Fieldale Farms, 270 Ga. at 274-275. Converse to express preemption, where the statute says that the a subject addressed by a general law is *not* appropriate for local regulation, the "except" provision permits the General Assembly "by general law [to] authorize local governments by local ordinance or resolution to exercise police powers" on a subject provided for by general laws. Sometimes the general law will clearly give the local government the authority to enact the ordinance at issue. See, e.g., Old South Duck Tours v. Mayor and Alderman of City of Savannah, 272 Ga. 869, 871 (535 SE2d 751) (2000). Where a comprehensive general law authorizes local regulation only on particular matters, however, local ordinances that regulate matters outside the scope of that specific authorization do not come under the "except" provision and remain impliedly preempted. See S.W.A.N. Consulting, 274 Ga. at 279 ("By expressly authorizing additional local regulation of the private detective and security business in [the] limited instance [of street patrol service], the [comprehensive general law] impliedly preempts the City's regulation of [private security] services in its adult entertainment establishments."); Fieldale Farms, 270 Ga. at 277 ("By explicitly granting this

7

narrow power to local governments [to assess reasonable monitoring fees and to seek an injunction if the fees were not paid], the statute by implication precludes counties from exercising broader powers.").

There is also a significant limitation on the General Assembly's power to authorize local regulation under the "except" provision of the Uniformity Clause: the local ordinance still cannot "conflict with general laws." See Fieldale Farms, 270 Ga. at 275 ("The [Uniformity Clause's] second provision provides for an exception to the general rule of preemption when general law authorizes the local government to act *and* the local ordinance does not conflict with general law." (emphasis added). See also Pawnmart, Inc. v. Gwinnett County, 279 Ga. 19, 20 (608 SE2d 639) (2005) ("[T]he Ordinance, because it also regulates Georgia's pawnbrokers, is preempted unless it is (1) authorized by general laws, and (2) does not conflict with them."). Such a conflict obviously exists where a local ordinance directly contradicts a general law in relevant part, see, e.g., Hill v. Tschannen, 264 Ga. App. 288, 290-291 (590 SE2d 133) (2003) (physical precedent only), but it also may arise where the local ordinance impairs or detracts from the general law's operation, rather than augmenting and strengthening it. See Fieldale Farms, 270 Ga. at 275. See also

8

Willis v. City of Atlanta, 285 Ga. 775, 777 (684 SE2d 271) (2009); Rabun County v. Georgia Transmission Corp., 276 Ga. 81, 87 (575 SE2d 474) (2003). Compare Grovenstein v. Effingham County, 262 Ga. 45, 46-47 (414 SE2d 207) (1992) (finding no conflict where a state statute prohibiting the furnishing of alcohol to persons under age 21 was augmented by the local ordinance at issue, which prohibited the same conduct under more specific circumstances by banning retail beer and wine licensees from selling to persons under age 21 and providing for revocation of their licenses for violations).

3. We will now apply these preemption principles to the general laws and local ordinance at issue in this case.

(a) We first address whether City Code § 3-57 is preempted under the analysis directed by the first part of the Uniformity Clause. As Gebrekidan acknowledges, the State's COAM Laws do not contain express statutory language preempting local ordinances on the subject of COAMs or COAM businesses. The superior court recognized, however, that the statutory scheme regulating the COAM industry is "voluminous," and we conclude that the court erred in holding that this comprehensive general law did not preempt the local ordinance by implication.

9

OCGA § 16-12-35 creates an exception to Georgia's criminal laws against gambling for certain coin operated games and other devices designed and manufactured for bona fide amusement purposes only, which are comprehensively regulated by the remainder of the COAM Laws in OCGA §§ 50-27-70 to 50-27-104.  The COAM Laws include findings by the General Assembly that "the ability to operate a bona fide coin operated amusement machine business in this state constitutes a privilege and not a right," that the State needs "to prevent the unregulated operation of the bona fide coin operated amusement machine business," and that

> the bona fide coin operated amusement machine business can be conducted in a manner to safeguard the fiscal soundness of the state, enhance public welfare, and support the need to educate Georgia's children through the HOPE scholarship program and pre-kindergarten funding authorized by . . . the Constitution.

OCGA § 50-27-70 (a).

The statutory scheme, which is now administered by the Georgia Lottery Corporation (GLC), is extensive.[6]  The COAM Laws define "bona fide coin operated amusement machines" both by way of general requirements and by

---

[6] Various provisions of the COAM Laws were amended effective July 1, 2015.  See Ga. L. 2015, p. 39.  None of the amendments appears to affect the issues in this case.  In particular, OCGA § 50-27-86 was not amended.

10

giving numerous examples of machines that fall within the general definition. See OCGA § 50-27-70 (b) (2) (A).[7] The statutes establish two classes of COAMs; require "master" licenses for COAM manufacturers, distributors, and owners and "location" licenses for owners and operators of businesses (like Gebrekidan's) where COAMs are available for play by the public; and impose annual licensing and permitting fees. See OCGA §§ 50-27-70 (b) (3) - (4), 50-27-71, 50-27-78. The COAM Laws limit the percentage of a location owner's

_____

[7] OCGA § 50-27-70 (b) (2) (A) says:

"Bona fide coin operated amusement machine" means every machine of any kind or character used by the public to provide amusement or entertainment whose operation requires the payment of or the insertion of a coin, bill, other money, token, ticket, card, or similar object and the result of whose operation depends in whole or in part upon the skill of the player, whether or not it affords an award to a successful player pursuant to subsections (b) through (g) of Code Section 16-12-35, and which can be legally shipped interstate according to federal law. Examples of bona fide coin operated amusement machines include, but are expressly not limited to, the following: (i) Pinball machines; (ii) Console machines; (iii) Video games; (iv) Crane machines; (v) Claw machines; (vi) Pusher machines; (vii) Bowling machines; (viii) Novelty arcade games; (ix) Foosball or table soccer machines; (x) Miniature racetrack, football, or golf machines; (xi) Target or shooting gallery machines; (xii) Basketball machines; (xiii) Shuffleboard games; (xiv) Kiddie ride games; (xv) Skeeball machines; (xvi) Air hockey machines; (xvii) Roll down machines; (xviii) Trivia machines; (xix) Laser games; (xx) Simulator games; (xxi) Virtual reality machines; (xxii) Maze games; (xxiii) Racing games; (xxiv) Coin operated pool tables or coin operated billiard tables as defined in paragraph (3) of Code Section 43-8-1; and (xxv) Any other similar amusement machine which can be legally operated in Georgia. The term also means a machine of any kind or character used by the public to provide music whose operation requires the payment of or the insertion of a coin, bill, other money, token, ticket, card, or similar object such as jukeboxes or other similar types of music machines.

income that may be derived from COAMs and the number of COAMs in a single location; regulate the terms of contracts between COAM owners and COAM lessees; and require owners and operators to report revenues and awards, with COAMs being electronically connected to the GLC, thereby allowing the State to easily monitor and collect a tax that starts at 5% of revenues and increases to 10% over time. See OCGA §§ 50-27-84, 50-27-102. It is a crime to misuse COAMs, such as by paying cash for successful plays, and there are numerous penalties for violating other provisions of the complex statutory scheme, such as provisions requiring the filing of reports. See OCGA §§ 16-12-35, 50-27-85. The GLC is authorized to provide for enforcement, see OCGA § 50-27-81, and several provisions of the COAM Laws give the GLC rulemaking authority, which has been exercised. See Ga. Comp. R. & Regs. Chapters 560-2-18 (Coin Operated Amusement Machines) and 560-2-19 (COAM Administrative Hearings).

In sum, the COAM Laws, the text of which (aside from annotations) fills more than 35 pages of the Georgia Code, establish by general laws precisely the sort of comprehensive statutory scheme regulating a subject – COAMs and COAM businesses – on a statewide basis that we have previously found gives

12

rise to implied preemption of local ordinances on the same subject. See, e.g., S.W.A.N. Consulting, 274 Ga. at 277-279 (discussing implied preemption under the Georgia Private Detective and Security Agencies Act); Fieldale Farms, 270 Ga. at 275-278 (discussing implied preemption under the Georgia Water Quality Control Act).

The City contends, however, that City Code § 3-57 is not a local ordinance on the same subject as the COAM Laws, arguing that § 3-57 regulates alcohol and not COAMs and is "primarily aimed at preventing loitering and illegal public consumption of packaged alcoholic beverages." The superior court seemed to agree, concluding that "City Code § 3-57 is not a local COAM regulatory system at all and does not duplicate any of the provisions of [the COAM Laws]." But in the preemption context, it is not the reason for or purpose behind the enactment of a local ordinance that controls. The proper focus is on the subject and operation of the general and local laws. City Code § 3-57 regulates packaged alcohol dealers, but it does so by prohibiting them from engaging in the COAM business – the same subject provided for by the COAM Laws. The superior court found persuasive the City's argument that § 3-57 prohibits *all* electronic and mechanical game machines at packaged alcohol

13

stores, not only COAMs as defined in the COAM Laws. In fact, that argument is a concession that § 3-57 regulates COAMs, even if it may also regulate other game machines. The only game machines at issue in this case are the ones that Gebrekidan operates in her business pursuant to a state license granted under the COAM Laws, which the City does not dispute are COAMs as defined by state law.

Nor does it matter, in the analysis under the first part of the Uniformity Clause, that the local ordinance does not duplicate any specific provision of the COAM Laws. As explained above, where the state statutory scheme is as comprehensive as the COAM Laws, we presume that the General Assembly meant to occupy the entire field of regulation on the subject, and thus that the gaps the legislature left were intended to be unregulated matters rather than spaces for local governments to fill by local regulation. Thus, contrary to the City's claim, § 3-57 is not an ordinance that only incidentally affects COAMs and COAM businesses. The direct effect of § 3-57 is to ban COAMs from businesses in the City of Clarkston where the State of Georgia allows them. For these reasons, we conclude that the COAM Laws preempt City Code § 3-57 by implication.

14

(b)     We must still determine, however, whether City Code § 3-57 can survive preemption by the COAM Laws under the "except" provision of the Uniformity Clause.  As outlined previously, in this analysis "the [o]rdinance, because it also regulates [COAMs and COAM businesses], is preempted unless it is (1) authorized by general laws, and (2) does not conflict with them." Pawnmart, 279 Ga. at 20.

We need not reach the conflict question, because the City cannot clear the first hurdle of this test, as it has not shown that general laws authorize City Code § 3-57.  The City asserts that the necessary authorization can be found in § 1.03

(w) of the City's charter[8] and in OCGA § 3-3-2 (a).[9]  The charter was enacted

by the General Assembly, and § 1.03 (w) grants broad police powers to the city

council, but the charter is a local law, not a general law.  See Borders v. City of

Atlanta, 298 Ga. 188, 192 (779 SE2d 279) (2015).  Thus, the charter cannot

provide the authorization of local regulation "by general law" that is required

by the "except" provision of the Uniformity Clause.  See Little v. City of

Lawrenceville, 272 Ga. 340, 341 (528 SE2d 515) (2000) ("Powers which the

legislature sets out in city charters 'are subject to limitations and preemptions

imposed by general law.'" (citation omitted)).

---

[8]  The charter of the City of Clarkston says in § 1.03:

**Corporate Powers.**  Be it further enacted, that the corporate powers of the city, to be exercised by the city council, may include the following:  . . . (w) To exercise and enjoy all other powers, functions, rights, privileges and immunities necessary or desirable to promote or protect the safety, health, peace, security, good order, comfort, convenience, morals, and general welfare of the city and its inhabitants; and to exercise all implied powers necessary to carry into execution all powers granted in the Act as fully and completely as if such powers were fully enumerated herein; and to exercise all powers now or in the future authorized to be exercised by other municipal governments under other laws of the State of Georgia.  No enumeration of particular powers in this Act shall be held to be exclusive of others, nor restrictive of general words and phrases granting powers; but shall be held to be in addition to such powers unless expressly prohibited to cities under the constitution or applicable public acts of the State.

Ga. L. 1967, p. 3391.

[9]  The text of OCGA § 3-3-2 (a) is set forth in footnote 1 above.

16

Conversely, OCGA § 3-3-2 (a) is a general law, but it does not authorize City Code § 3-57. That ordinance does not address the "granting or refusal, suspension, or revocation" of City licenses to manufacture, distribute, or sell alcoholic beverages, OCGA § 3-3-2 (a); it simply makes it illegal for certain alcoholic beverage dealers in Clarkston to permit COAMs on their premises that state law allows. This conclusion is bolstered by the fact that the COAM Laws authorize local governments to adopt and enforce ordinances regulating COAM businesses in 11 specific respects, but not in the way that City Code § 3-57 attempts to regulate them. See OCGA § 50-27-86.[10] Two provisions authorize

---

[10] OCGA § 50-27-86 says:

In addition to the state regulatory provisions regarding bona fide coin operated amusement machines contained in Code Section 16-12-35 and this article, the governing authority of any county or municipal corporation shall be authorized to enact and enforce an ordinance which includes any or all of the following provisions:

(1) Prohibiting the offering to the public of more than six Class B machines that reward the player exclusively with noncash merchandise, prizes, toys, gift certificates, or novelties at the same business location;

(2) Requiring the owner or operator of a business location which offers to the public any bona fide coin operated amusement machine that rewards the player exclusively as described in subsection (d) of Code Section 16-12-35 to inform all employees of the prohibitions and penalties set out in subsections (e), (f), and (g) of Code Section 16-12-35;

(3) Requiring the owner or possessor of any bona fide coin operated amusement machine that rewards the player exclusively as described in subsection (d) of Code Section 16-12-35 to inform each location owner or location operator of the business location where such machine is located of the prohibitions and penalties set out in subsections (e), (f), and (g) of Code Section 16-12-35;

(4) Providing for the suspension or revocation of a license granted by such local

17

governing authority to manufacture, distribute, or sell alcoholic beverages or for the suspension or revocation of any other license granted by such local governing authority as a penalty for conviction of the location owner or location operator of a violation of subsection (e), (f), or (g) of Code Section 16-12-35, or both. An ordinance providing for the suspension or revocation of a license shall conform to the due process guidelines for granting, refusal, suspension, or revocation of a license for the manufacture, distribution, or sale of alcoholic beverages set out in subsection (b) of Code Section 3-3-2;

(5) Providing for penalties, including fines or suspension or revocation of a license as provided in paragraph (4) of this subsection, or both, for a violation of any ordinance enacted pursuant to this subsection; provided, however, that a municipal corporation shall not be authorized to impose any penalty greater than the maximum penalty authorized by such municipal corporation's charter;

(6) Requiring any location owner or location operator subject to paragraph (1) of subsection (b) of Code Section 50-27-84 to provide to the local governing authority a copy of each verified monthly report prepared in accordance with such Code section, incorporating the provisions of such Code section in the ordinance, providing for any and all of the penalties authorized by subsection (d) of Code Section 50-27-84, and allowing an annual audit of the reports from the location owner or location operator;

(7) Requiring the location owner or location operator of any business location which offers to the public one or more bona fide coin operated amusement machines to post prominently a notice including the following or substantially similar language:

GEORGIA LAW PROHIBITS PAYMENT OR RECEIPT OF MONEY FOR WINNING A GAME OR GAMES ON THIS AMUSEMENT MACHINE; PAYMENT OR RECEIPT OF MONEY FOR FREE REPLAYS WON ON THIS AMUSEMENT MACHINE; PAYMENT OR RECEIPT OF MONEY FOR ANY MERCHANDISE, PRIZE, TOY, GIFT CERTIFICATE, OR NOVELTY WON ON THIS AMUSEMENT MACHINE; OR AWARDING ANY MERCHANDISE, PRIZE, TOY, GIFT CERTIFICATE, OR NOVELTY OF A VALUE EXCEEDING $5.00 FOR A SINGLE PLAY OF THIS MACHINE.;

(8) Providing for restrictions relating to distance from specified structures or uses so long as those distance requirements are no more restrictive than such requirements applicable to the sale of alcoholic beverages;

(9) Requiring as a condition for doing business in the jurisdiction disclosure by the location owner or location operator of the name and address of the owner

18

local ordinances suspending or revoking alcohol and other licenses granted by the local government, but only as a penalty for conviction of the COAM location owner or operator for violating certain parts of the COAM Laws or for violation of an ordinance enacted pursuant to § 50-27-86. See OCGA § 50-27-86 (4) - (5). Another provision allows local governments to impose location restrictions on COAMs that are no more restrictive than the local location restrictions applicable to the sale of alcoholic beverages. See OCGA § 50-27-86 (8).

Thus, in enacting the comprehensive COAM Laws, the General Assembly considered their interaction with local alcohol regulations, but the legislature did not authorize local governments to flatly prohibit alcoholic beverage licensees from allowing COAMs on their premises or to penalize such businesses for doing so. For these reasons, insofar as City Code § 3-57 directly regulates COAMs as defined by the COAM Laws, we conclude that the local ordinance is not authorized by general law, and thus the ordinance is not saved from

---

of the bona fide coin operated amusement machine or machines;

(10) Requiring that all bona fide coin operated amusement machines are placed and kept in plain view and accessible to any person who is at the business location; and

(11) Requiring a business that offers one or more bona fide coin operated amusement machines to the public for play to post its business license or occupation tax certificate.

19

preemption by the COAM Laws under the "except" provision of the Uniformity Clause. See S.W.A.N. Consulting, 274 Ga. at 279; Fieldale Farms, 270 Ga. at 277. Compare Grovenstein, 262 Ga. at 46-47. We therefore reverse the contrary judgment of the superior court.

Judgment reversed. All the Justices concur.